**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

NATIONAL ENERGY & GAS                *
TRANSMISSION, INC.

   Appellant/Debtor,          *

  v.                                          *          Civil Action No. AW-06-2592

LEHMAN BROTHERS, INC.,          *

   Appellee.                        *
          * * * * *

**<u>MEMORANDUM OPINION</u>**

  This bankruptcy appeal arises from an order of Judge Paul Mannes, United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court"), denying summary judgment in favor of Appellant and granting summary judgment in favor of Appellee on Appellant/Debtor's Amended Objection to Claim Nos. 14 and 699 filed by Appellee.  The appeal has been fully briefed, and no hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2004).  For the reasons explained more fully below, the Court affirms the order of the Bankruptcy Court.

**<u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

  The facts of this case are not in dispute.  The claims at issue in this appeal are based upon a November 25, 2002 professional services agreement (the "Agreement") entered into between National Energy & Gas Transmission ("NEGT" or "Debtor") and Lehman Brothers ('Lehman").  Under the Agreement, Lehman was to perform certain investment banking services for NEGT, including, *inter alia*, advisory services concerning the potential sale of certain NEGT equity interests.  Lehman was to be paid for its services with a success fee based upon the percentage of the gross sale amount of a transaction or transactions arising from the sale of particular NEGT equity

1

stock interests.   The Agreement is governed by New York Law.   Primarily at issue is the

interpretation of two provisions of the Agreement, which provide that

> [s]hould the Company [NEGT] elect to terminate this Agreement pursuant to paragraph 11 below, Lehman Brothers will promptly provide the Company with a list of entities contacted with respect to any transaction contemplated by this Agreement (the "List").  Should the Company, subsequent to the termination of this Agreement and within 12 months of such termination, announce a transaction with any party on the List, then the Company will pay Lehman Brothers a fee in accordance with paragraph 2, as appropriate (the "Tail Provision").[1]

> Lehman Brothers acknowledges that should the Company become subject to a bankruptcy proceeding, this Agreement will need to be approved by the Bankruptcy Court in order for it to continue to be in force and effect.  NEG[T] agrees to use reasonable best efforts to seek such approval from the Bankruptcy Court (the "Approval Provision").

Agreement ¶ 2(e).

It is undisputed that Lehman provided extensive and satisfactory services to NEGT under

the Agreement.  *See* Decl. of Thomas B. King, the former president of NEGT (February 22, 2006)

("King Declaration").   TransCanada, the eventual purchaser of the assets, had "initially been

brought to NEG[T]'s attention by Lehman" and Lehman regularly provided written reports to NEGT

about the TransCanada bid.   King Decl., ¶¶ 9, 13.   After fielding several bids for the assets,

TransCanada emerged as the winning bidder.   However, NEGT decided not to go ahead with the

deal because of financial difficulties.   King Decl. ¶ 12.

On July 8, 2003 (the "Petition Date"), NEGT and its affiliated companies filed voluntary

---

[1] Paragraph 11 of the Agreement stated that either party may terminate Lehman's engagement at any time by giving the other party at least 10 days' prior written notice. Also, NEGT was required to notify Lehman of the names of all parties with whom NEGT had "discussions or contacts" during the 12 months prior to or during the Agreement concerning a sale of NEGT, "which parties shall be deemed to be included on the List." Agreement, ¶ 4(a). It is undisputed that, through Lehman's efforts, NEGT had discussions and contacts with TransCanada, the eventual purchaser, during the 12 months prior to the termination of the Agreement.

bankruptcy petitions under Chapter 11 of the Bankruptcy Code.  At the same time, NEGT moved the Bankruptcy Court to reject the Agreement pursuant to Section 365(a) of the Bankruptcy Code ("Rejection Motion").  The Rejection Motion averred that as a result of extensive discussions with creditors and "in light of the Company's current restructuring plan, the services that Lehman was to provide under the [Agreement] are no longer necessary.  In fact, Lehman has not performed any services under the Lehman Agreement since April 2003, and the estates have derived no benefit from the Lehman Agreement."  The Rejection Motion also stated that "[d]ue to the fact that Lehman has not performed any services for the Debtors and is not going to be retained to perform services for the Debtors pursuant to section 330 of the Bankruptcy Code, Lehman is not entitled to an administrative claim."  Rejection Motion n.9.   NEGT acknowledged that the Tail Provision "may survive termination" of the Agreement.  Rejection Motion ¶ 21.  By Order dated August 6, 2004, the Bankruptcy Court approved rejection of the Agreement, effective as of the Petition Date.

On February 24, 2004, NEGT and TransCanada announced in a press release that TransCanada would acquire the relevant NEGT assets for approximately $1.7 billion.  The announcement occurred within 12 months of the Rejection Motion, as well as within 12 months of the effective date of the retroactive rejection of the Agreement.  Lehman timely filed its proof of claim and filed an amended claim on July 28, 2004 (the "Amended Claim"), seeking the amount of $7,217,000 under the Tail Provision of the Agreement relating to the sale of the assets to TransCanada.

In January 2005, the Debtors filed an Objection (the "Objection"), to the Amended Claim, asserting that Lehman had "ceased performance under the Agreement in or about April of 2003."  Obj. ¶ 12.  "As a result of Lehman's unwillingness or inability to perform under the Agreement, the

Debtors had to replace Lehman.  The Debtors, therefore, concluded that the estates derived no benefit from the Agreement."  Obj. ¶ 13.  In January 2006, one full year after filing their original Objection, the Debtors filed an Amended Objection (the "Amended Objection"), in which they abandoned this position, and adopted three different bases for their objection. First, the Debtors asserted that the Tail Provision required Lehman to furnish a List of contacts it had solicited to NEGT, that this constituted a condition precedent to NEGT's "tail" compensation obligation, and that no List was ever provided.  Second, the Debtors claimed that the announcement of the deal with TransCanada took place more than 12 months after all work by Lehman on the sale was completed and was thus outside the Tail Provision.  Finally, the Debtors claimed that the Agreement is not enforceable due to legal impossibility.  The Debtors essentially argued that since Lehman provided investment banking services to NEGT prior to the bankruptcy filing, Lehman was not a "disinterested person" within Sections 101(14)(B),(C) and 327(a) of the Bankruptcy Code and thus "was disqualified from being retained as [NEGT's] broker for the pipeline sale during this bankruptcy case." Am. Obj. ¶ 32.

Thereafter, NEGT filed a Motion for Summary Judgment on the Objection and Lehman filed a cross-motion for summary judgment. After a hearing held before the Bankruptcy Court on August 16, 2006, the Bankruptcy Court entered a Memorandum of Decision (the "Opinion") and Order granting summary judgment in favor of Lehman and denying NEGT's motion for summary judgment.

## STANDARD OF REVIEW

This Court reviews the legal conclusions of the Bankruptcy Court *de novo*, but reviews its factual determinations for clear error.  *Butler v. Shaw*, 72 F.3d 437, 441 (4th Cir.1996); *Three Flint*

*Hill Ltd. Pshp. v. Prudential Ins. Co. (In re Three Flint Hill Ltd. Pshp.)*, 213 B.R. 292, 297 (D. Md.

1997).  On legal issues, this Court "must make an independent determination of the applicable law."

*In re Jeffrey Bigelow Design Group, Inc.*, 127 B.R. 580, 582 (D. Md. 1991), *aff'd*, 956 F.2d 479 (4th

Cir. 1992).

Summary judgment is only appropriate if there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323-25 (1986).  Since the facts of this case are not in dispute, the Court will

review the Bankruptcy Court's grant of summary judgment *de novo*.  On a motion for summary

judgment, the moving party discharges its burden by showing an absence of evidence to support the

nonmoving party's case.  *Celotex*, 477 U.S. at 325.  The court must "draw all justifiable inferences

in favor of the nonmoving party, including questions of credibility and of the weight to be accorded

to particular evidence."  *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal

citations omitted).  However, the party who bears the burden of persuasion on a particular claim

must present legally sufficient evidence to support each element of his claim.  "[A] complete failure

of proof concerning an essential element . . . necessarily renders all other facts immaterial."  To

defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or

other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to

be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine

dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX*

*Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.

1985).

## ANALYSIS

The resolution of this appeal turns on the interpretation of the Tail and Approval provisions of the Agreement between NEGT and Lehman.  Lehman's claims in bankruptcy are based on amounts allegedly due under the Tail Provision.  Lehman essentially claims that by rejecting the Agreement simultaneously with the filing of bankruptcy, NEGT's conduct effectively triggered the Tail Provision of the Agreement.  NEGT counters with several arguments, including: 1) basic contract theories of impossibility and mistake; 2) the Agreement has no force or effect as it was not approved by the Bankruptcy Court as provided by the Approval Provision; and 3) a condition precedent to Lehman receiving a success fee under the Tail Provision was not satisfied.

A.  Impossibility and Mistake

The Court will first address NEGT's impossibility and mistake arguments.  NEGT contends that Lehman could not be employed by NEGT post-petition because Lehman was not a disinterested person as contemplated by the Bankruptcy Code.  *See* 11 U.S.C. § 327(a).  According to NEGT, this legal impossibility of performance, or alternatively mutual mistake, created by operation of the Bankruptcy Code, excused and discharged the performance obligations of the parties, thereby precluding the Lehman Claims.  Disposing of NEGT's arguments, the Bankruptcy Court reasoned that since "[i]t was only after Lehman substantially performed its work that NEG[T] looked elsewhere and hired another investment banker," the contract could not be voided by virtue of mutual mistake.  The Bankruptcy Court offered no other reasoning with respect to its disposition of NEGT's impossibility and mistake arguments.

Although the Bankruptcy Court's reasoning is scant, this Court finds no error in the Bankruptcy Court's legal conclusion.  With respect to NEGT's impossibility argument, it is clear

from the record that both parties anticipated the possibility of bankruptcy. At the motions hearing before the Bankruptcy Court, counsel for NEGT basically conceded the impossibility argument:

> But, Your Honor, with regard to this, I heard their argument back about impossibility. And if it's something that can be anticipated, well, the law doesn't allow for recission of the contract and impossibility.

Hr'g Tr. 27: 6-9, August 16, 2006. In addition, by virtue of its voluntary filing of bankruptcy, NEGT is unable to avail itself of an impossibility defense. *See*, *e.g.*, *In re Mr. Movies, Inc.*, 287 B.R. 178, 186 (Bankr. D. Minn. 2002) (rejecting the debtor's impossibility defense because "[t]he Debtor voluntarily filed a bankruptcy petition which created the very disability of which it complains."). Here, although the parties contemplated bankruptcy, it was NEGT's voluntary filing of bankruptcy that triggered the inability of Lehman to serve as investment banker postpetition. As such, NEGT cannot be excused from its contractual obligations under the theory of impossibility.

As an alternative to its impossibility defense, NEGT argues that the Agreement should be voided as a result of mutual mistake. Under New York contract law, "where a mistake in contracting is both mutual and substantial, there is an absence of the requisite 'meeting of the minds' to the contract and relief will be provided in the form of rescission." *County of Orange v. Grier*, 30 A.D.3d 556, 556-57 (N.Y. App. Div. 2006) (internal quotations omitted). "The mutual mistake must exist at the time the contract is entered into and must be substantial." *Gould v. Bd. of Educ.*, 616 N.E.2d 142, 146-47 (N.Y. 1993).

NEGT contends that the Approval Provision in the Agreement demonstrates that the parties were mutually mistaken about NEGT's legal ability to continue using Lehman's services if NEGT filed a bankruptcy petition. Since such a circumstance was legally impossible by operation of bankruptcy law, NEGT argues that Lehman and NEGT each held this mistaken assumption when

they executed the Agreement.  Although the parties may have been mistaken as to the ability of Lehman to continue its role as investment banker postpetition, the Court does not believe that this mistake is sufficiently material or substantial to warrant recission of the Agreement.  The essential terms of the Agreement involved Lehman's employment to sell certain assets of NEGT and NEGT, in turn, to compensate Lehman for those services.  The eventual need for approval of the Agreement by the Bankruptcy Court and/or Lehman's continued service after a potential filing of bankruptcy are simply incidental circumstances that further the essential goal of the Agreement.  As such, the mistaken belief that Lehman was able to continue as investment banker post-petition will not void the Agreement.

Furthermore, it is black letter law that contract recission is an equitable remedy.  Equity regards that as done which ought to be done.  *Van Curler Development Corp. v. Schenectady*, 300 N.Y.S.2d 765, 775 (N.Y. Misc. 1969); *Stephens v. Evans*, 75 N.Y.S.2d 909, 910 (N.Y. Misc. 1947). In this case, the equities weigh in favor of Lehman.  At the time of filing its bankruptcy petition, NEGT neither sought the approval of the Agreement nor the continued services of Lehman.  Only after Lehman had substantially performed its obligations did NEGT seek out the services of another investment banker.  There is no dispute that NEGT eventually closed the deal with a purchaser originally brought forward by Lehman.  NEGT's conduct, at the very least, indicates a willingness on NEGT's part to benefit from Lehman's services under the Agreement, but an unwillingness to fulfill its own obligations under the Agreement.  A rescission of the Agreement under the present circumstances will result in a windfall for NEGT.  This Court cannot, in good conscience, allow such an inequitable result.  Therefore, the Bankruptcy Court's refusal to rescind the Agreement on grounds of impossibility and mistake is affirmed.

8

B.  Approval Provision

The Court now turns to NEGT's argument that the Agreement has no force or effect as it was not approved by the Bankruptcy Court as provided by the Approval Provision.  It is Memorandum of Decision, the Bankruptcy Court reasoned that

> [w]hile the employment of Lehman as an investment banker was barred, that fact prevented only allowance of any administrative expenses to Lehman pursuant to 11 U.S.C. § 503(b).   However, this dispute is not over the allowance of an administrative claim wherein the court must first approve the appointment of Lehman pursuant to 11 U.S.C. § 330(a)(1), but over the allowance of an unsecured claim without priority under 11 U.S.C. § 502(b).  The issue for decision is whether Lehman belongs in the pool of creditors paid pro rata for services rendered prior to the filing of the bankruptcy case.  The effect of rejection of an executory contract under 11 U.S.C. § 365(g) is that of a breach of the contract and a claim arising from that breach is allowed or disallowed as if the claim had arisen immediately before the date of the filing of the petition.  The fact that the Agreement was no longer in effect is of no significance to the allowance of the contingent claim originally filed by Lehman.

Mem. of Decision at 4-5 (internal citations omitted).  This Court finds no error in the Bankruptcy Court's application of the law to NEGT's Approval Provision arguments.[2]  There is no dispute here that on the Petition Date NEGT simultaneously moved the Bankruptcy Court to reject the Agreement.  The law makes clear that rejection of an executory contract constitutes a breach of the contract.  *See In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997);  *In re Alongi*, 272 B.R. 148, 152 (Bankr. D. Md. 2001).  Therefore, the effect of NEGT's rejection of the Agreement is a breach of the Agreement, deemed to have occurred immediately before the Petition Date.  Therefore, the Bankruptcy Court was correct in holding that, as a result of NEGT's breach, Lehman has an unsecured claim against NEGT for damages.

---

[2] Particularly, the Court agrees with the Bankruptcy Court that this case does not present an issue of the allowance of an administrative claim.  Rather, the Bankruptcy Court correctly determined that Lehman's position is that of an unsecured creditor.

C.  The Tail Provision

        The Bankruptcy Court reasoned that Lehamn's "claim was contingent, because no money was due Lehman unless within twelve months of termination, an applicable transaction was announced."  Mem. of Decision at 5.  NEGT argued below, as it does here, that the Tail Provision was never activated because NEGT did not elect to terminate the Agreement.   An elective termination, NEGT argues, is a condition precedent to the operation of the Tail Provision.  The Bankruptcy Court flatly rejected NEGT's argument, characterizing the argument as a remarkable exercise in casuistry."  Mem. of Decision at 5.  Although this Court agrees with the Bankruptcy Court's ultimate resolution of the issue, the Court thinks it necessary to expound on the Bankruptcy Court's reasoning.

        NEGT is correct in its assertion that the rejection of an executory contract in bankruptcy merely constitutes a breach of the contract and not a termination of the contract.  *See In re Yasin,* 179 B.R. 43, 50 (Bankr. S.D.N.Y. 1995).  Therefore, "the rights and obligations of the parties remain intact after a rejection because rejection does not change the substantive rights of the parties to the contract, but merely means the bankruptcy estate itself will not become a party to it."  *In re Alongi*, 272 B.R. 148, 153 (Bankr. D. Md. 2001) (internal quotations omitted).  The Second Circuit has also offered an explanation of the distinction:

>        The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor.  However, the Code does not determine parties' rights regarding the contract and subsequent breach.  To determine these rights, we must turn to state law.  *See In re Yasin,* 179 B.R. 43, 50 (Bankr. S.D.N.Y. 1995) (because "rejection constitutes a statutory breach, but does not repudiate or terminate the [contract,] [t]he parties must . . . resort to state law to determine their rights as a result of the breach").

*In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997).  Under New York law, a breach of the Agreement

by NEGT relieved Lehman of its obligations to perform under the Agreement.  However, at the time

of the breach, Lehman had already substantially performed, including performing substantial work

with the eventual buyer of NEGT's assets.  Therefore, Lehman has at least some claim for damages

against NEGT.

NEGT couches the status of the Agreement as canceled or nullified.  Lehman classifies it as

terminated.  Either way, there is no real dispute here that the Agreement has ended.  Furthermore,

the parties have agreed that the issue in this case is an "all or nothing" determination.  Hr'g Tr. 17:

16-21, August 16, 2006.  The proper resolution of the issue requires the Court to make a

determination as to the parties' intent at the time of executing the Agreement with respect to the Tail

Provision.  NEGT urges the Court to find that since NEGT did not elect to terminate the Agreement,

the Tail Provision does not apply.  Lehman suggests that the Court take a more practical approach

and find that NEGT's conduct, while not an elective termination per se, constituted a termination

of the Agreement.  The Court agrees with Lehman.  As between the parties, NEGT's conduct

evidences a departure from the reasonable intent of the parties.

At the time the Agreement was executed, the parties contemplated the possibility of

bankruptcy.  As a result, the parties included the Approval Provision to encourage NEGT to seek

the approval of the Agreement in bankruptcy and the continued services of Lehman.  Wholly

separate from the Approval Provision is the Tail Provision.  The Tail Provision provides that

Lehman will be compensated if, within a year after the Agreement is terminated, NEGT sells its

assets to an entity originally brought to NEGT by Lehman.  The purpose of the Tail Provision is to

protect Lehman in the event of a situation where NEGT uses Lehman's services to solicit a potential

buyer, and then, after terminating Lehman's services, NEGT closes with the buyer within a

11

relatively short period of time.

Although the parties used the word *terminate* to describe the triggering mechanism, their intention was to ensure that Lehman is compensated in the event that Lehman brings a buyer to the table and NEGT closes with that buyer during Lehman's employment or within a year thereafter. That is exactly what happened here.  Although NEGT may not have technically terminated the Agreement, the triggering mechanism was there.  Lehman brought TransCanada to NEGT as the winning bidder.  Then, NEGT decided not to go forward with TransCanada because of NEGT's own financial difficulties.  Months later, NEGT voluntarily filed bankruptcy proceedings.  At the same time, NEGT voluntarily and affirmatively moved to reject the Agreement.  NEGT also moved to allow another investment banker to proceed post-petition.  Shortly thereafter, the sale of NEGT's assets to TransCanada was announced.  Lehman did everything it was required to do under the Agreement.  NEGT, on the other hand, has not lived up to its end of the bargain.  As such, the Court finds that NEGT's conduct constituted an effective termination of the Agreement, triggering the operation of the Tail Provision.  The Bankruptcy Court's grant of summary judgment allowing Lehman's now liquidated claim must be affirmed.

## CONCLUSION

For the reasons stated above, the Court will affirm the order of the Bankruptcy Court.  An Order consistent with this opinion will follow.


__March 28, 2007__            __/s/__
     Date                                 Alexander Williams, Jr.
                                      United States District Judge